Filed 9/4/20  P. v. Bell CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B296533 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA462861) |
| v. | |
| LENTON DWANE BELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed.

Eileen Manning-Villar, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Lenton Dwane Bell was convicted of willfully inflicting corporal injury resulting in a traumatic condition upon someone with whom he had a dating relationship, in violation of Penal Code section 273.5, subdivision (a).[1] The trial court sentenced Bell to the upper term of four years in state prison.

On appeal, Bell raises the following claims: (1) in imposing the upper term, the court improperly relied upon certain aggravating factors and ignored mitigating factors raised by his trial counsel; and (2) the court committed prejudicial error by excluding evidence that the victim had punched herself in the head approximately one month prior to the incident at issue.

We conclude that Bell has not overcome the presumption that the trial court properly exercised its broad discretion in selecting the upper term. Further, except for a ruling sustaining a hearsay objection (a ruling that Bell does not challenge), the record does not show the trial court actually did bar Bell from introducing evidence that the victim harmed herself on a prior occasion. We thus affirm the judgment.

## PROCEDURAL BACKGROUND

On February 22, 2019, the People filed an amended information charging Bell with willfully inflicting corporal injury resulting in a traumatic condition upon T.F., someone "with whom [he] had a dating relationship," in violation of section 273.5, subdivision (a); forcible rape of T.F., as defined by section 261, subdivision (a)(2); and attempted forcible oral copulation with T.F., in violation of section 664 and former

---

[1] Undesignated statutory citations are to the Penal Code.

section 288a, subdivision (c)(2)(A). Bell pleaded not guilty to each count.

Prior to trial, the People filed a brief: (1) noting that at the preliminary hearing, defense counsel had elicited testimony from T.F. to the effect that she "had hit herself a month prior to the instant matter"; and (2) moving to exclude "this self-harm line of questioning absent a showing that the victim wrongfully accused the defendant of this prior harm." The People argued this testimony constituted propensity evidence that is barred by Evidence Code section 1101,[2] and that it is not admissible habit evidence under Evidence Code section 1105.[3] The People sought to "exclude this self-harm line of questioning absent a showing that the victim wrongfully accused [Bell] of this prior harm."

At a pretrial hearing, the trial court and the parties addressed the People's motion to exclude evidence that T.F. had hit herself a month prior to the incident. The trial court asked defense counsel to describe the "surrounding circumstances regarding the hitting" and stated that this evidence would not "have much probative value" and it would encounter "a 352

_____

[2] Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[3] Evidence Code section 1105 provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

3

issue"[4] if the victim had not "frame[d] somebody" for hitting her. When defense counsel indicated that he was unable to provide much information concerning the circumstances of T.F.'s self-hitting because he did not "explore that with her during cross-examination" at the preliminary hearing, the trial court expressed skepticism regarding the relevance of the evidence.

The trial court then asked defense counsel to obtain witness statements regarding the victim's self-hitting to make sure "there's a good faith basis for [admitting] it." Defense counsel simply responded, "Okay. Thank you," and the hearing concluded.

At the conclusion of the trial, the jury found Bell guilty of willfully inflicting corporal injury resulting in a traumatic condition upon T.F., but acquitted him of the other two offenses.

On March 8, 2019, the trial court sentenced Bell to the upper term of four years in state prison. (See § 237.5, subd. (a) ["Any person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years . . . ."].) The trial court reasoned: "There was a threat of great bodily injury in this case, which is an aggravating factor. [Bell's] actions were demonstrative of a high degree of callousness for the victim. The victim was particularly vulnerable during

---

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

this.  So I don't really see a lot of mitigating circumstances."  The court further remarked that "[t]here were pretty serious injuries to the victim, and [Bell's] attitude after that was very callous. . . . [T.F.] offered to get him [a vehicle from a business that provides transportation services] and he demanded that she take him [home], and he wanted to control the situation throughout."  The court also observed that it did not "think [Bell] is remorseful."

Bell thereafter timely appealed the judgment.

## FACTUAL BACKGROUND

Below is a summary of the People's and the defense's respective theories of the case.

### 1.    The People's Theory of the Case

Bell and T.F. are both recovering narcotics addicts.  The two began dating in August of 2016.  "The relationship went well for the first six months."  Several months into their relationship, however, Bell resumed using crack cocaine.

On the morning of November 2, 2017, T.F. attempted to end her relationship with Bell over the telephone because she did not approve of his use of crack cocaine; T.F. suggested that he date women who drink alcohol and use narcotics.  Bell responded by threatening to kill T.F. and himself.  Notwithstanding this threat, T.F. arranged to transport Bell to her residence to allow him to retrieve certain personal belongings.

After they arrived at T.F.'s residence, T.F. told Bell to pack up his belongings.  Bell instead "acted like he wanted to hang out there."  When Bell received a telephone call a short time later, T.F. heard a woman's voice through the speaker.  T.F. was jealous; she asked for the identity of the caller and tried to grab

5

the telephone from Bell. Bell laughed and attempted to keep his telephone away from her.

At some point, Bell and T.F. moved to T.F.'s bedroom. Bell began pulling T.F.'s pants and underwear down, and T.F. resisted by telling Bell, "No!" She relented after Bell grabbed her by the neck and pushed her against the wall. Bell pushed T.F. onto the bed, removed his pants, and told her to suck his erect penis, but T.F. refused to do so. T.F. felt something on her face, but did not know if it was Bell's penis. Bell forced T.F.'s legs open and inserted his penis inside her for about five minutes until he ejaculated; T.F. did not say anything or attempt to push Bell off of her.

Bell and T.F. got dressed and went into T.F.'s living room. Bell said to T.F., " 'So you think you're big and bad. Over the phone, you think you're big and bad.' " Bell started striking T.F. on her head, face, legs, and ribs. T.F. attempted to flee through the front door, but Bell blocked it. As T.F. attempted to shield herself from the blows by curling up into a ball, Bell kicked and pushed her.

Bell stopped assaulting T.F. when he saw her eye begin to swell. Bell then gave T.F. his telephone and told her she could call the police, but T.F. declined to do so. Bell told T.F. that he had to hit her because she previously drove away with his money to prevent him from buying crack cocaine. Because T.F. saw that Bell was offering a justification for hitting her, she feared that he was going to hit her again and decided to appease him by "playing nice." When Bell asked her what she wanted to do, T.F. suggested that Bell repair her front door, and he thereafter did so.

T.F. later offered to arrange to have a transportation service take Bell home, and Bell responded by pushing T.F., threatening her, and throwing "fake punches" at her. When T.F. mentioned that some construction workers were nearby, Bell replied that he did not "give a fuck about them" and that he was going to "fuck [her] up anyway." T.F. subsequently drove Bell back to his apartment, and she reported this incident to the police later that day.

## 2.  The Defense's Theory of the Case

On several occasions, T.F. had demonstrated that she was jealous of other women Bell knew. For instance, T.F. had accused Bell of looking at T.F.'s female psychologist "in a certain way." Furthermore, whenever Bell received a telephone call, T.F. insisted on knowing the identity the caller. When Bell did not wish to disclose the identity of a particular caller, he would try to keep her away from his telephone. Additionally, during the early morning hours of November 2, 2017, T.F. cursed at Bell and threw a lamp at him when she discovered that a young woman was with him at his apartment.[5]

Later that day, T.F. drove Bell to her residence. Once there, Bell received a telephone call, and T.F. demanded to know the identity of the caller. When Bell refused to provide this information, they both fell on the couch and wrestled for the telephone for at least one minute. T.F. obtained the telephone and saw that a person named Tracy was the caller. The couple had " 'play wrestled' " over the telephone on at least 10 previous

---

[5] Similarly, T.F. admitted at trial that in September 2017, she slapped Bell's face after he had called her an idiot and pushed her. She claimed that Bell retaliated by slapping her.

7

occasions, and T.F. had always succeeded in getting the telephone. T.F. was physically stronger than Bell, and Bell weighed approximately 130 pounds.

While at T.F.'s apartment, Bell later received another call, and the pair wrestled again until T.F. obtained possession of his telephone. Bell denied forcing T.F. down and trying to remove her pants.

T.F. transported Bell back to his apartment and she stayed there for about an hour. During that timeframe, Bell told her that he wanted to end their relationship because he was tired of T.F.'s use of Tarot cards, her insistence on going to séances, her attempts to trick him into going to psychic readings, and her walking out of church services. T.F. asked Bell if he was sure he wanted to break up, and Bell confirmed that he was confident about that decision. T.F. replied, " 'You're going to regret it.' "

## DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion in Sentencing Bell to the Upper Term of Four Years' Imprisonment

Bell contends "[t]he trial court erred when it sentenced [him] to the upper term of four years in state prison[ ] because it relied on improper aggravating factors" and failed to "give appropriate weight to the mitigating circumstances presented here." With regard to his first contention, Bell argues the trial court improperly relied upon the following aggravating factors: (1) Bell exposed T.F. to a threat of great bodily harm; (2) Bell acted with a high degree of callousness; and (3) T.F. was particularly vulnerable.

8

We review Bell's challenge to his sentence for abuse of discretion. (§ 1170, subd. (b) ["When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."]; *People v. Lamb* (1988) 206 Cal.App.3d 397, 401 (*Lamb*) ["Generally, determination of the appropriate term is within the trial court's broad discretion [citation] and must be affirmed unless there is a clear showing the sentence choice was arbitrary or irrational [citation]."].) For the reasons discussed below, we conclude that Bell fails to satisfy this deferential standard.[6]

### 1.   *Threat of Great Bodily Harm*

Bell argues the trial court abused its discretion in relying upon this aggravating factor because "[s]ome violence and some threat of great bodily injury are inherent in the offense itself" (i.e., the violation of section 273.5, subdivision (a)); "[T.F.'s] 'injuries did not require medical treatment nor was she hospitalized' "; and "[t]he facts in some published section 273.5, subdivision (a) appeals illustrate markedly higher levels of violence and greater threats of bodily harm than were present in this case." As Bell summarizes his argument, this factor is

---

[6] Because we exercise our discretion to reach the merits of Bell's challenge to his sentence, we need not pass upon his alternative claim that trial counsel rendered ineffective assistance by failing to preserve this challenge for appeal. (Cf. *People v. Urbano* (2005) 128 Cal.App.4th 396, 404 [concluding that an appellant's claim that his trial counsel rendered ineffective assistance by failing to object was moot because the appellate court had exercised its discretion to reach the merits of the appellant's challenges to his sentence].)

9

inapplicable because his offense was not "distinctively worse than the ordinary." (See also *People v. Hicks* (2017) 17 Cal.App.5th 496, 512 ["Insofar as imposition of the upper term is concerned, '[a]n aggravating circumstance is a fact that makes the offense "distinctively worse than the ordinary." ' "].)

Bell's first contention fails for two reasons. First, the mere fact that section 273.5, subdivision (a) requires "some violence" on the part of the perpetrator does not negate the trial court's implicit finding that Bell's violent conduct was distinctively worse than the ordinary violation of that statute. Second, a threat of great bodily harm is not inherent in this offense because section 273.5, subdivision (a) does not require such a showing, (see § 273.5, subd. (a)), and " 'serious bodily injury' " and " 'force likely to produce great bodily injury' " are not required thereunder; rather, injury of a " 'minor . . . nature' " is sufficient to give rise to liability under section 273.5, subdivision (a), so long as the harm was not "de minimis." (See *People v. Gutierrez* (1985) 171 Cal.App.3d 944, 951–953 & fn. 6.)

Bell's claim that T.F.'s injuries did not require medical treatment is also unavailing. California Rules of Court, rule 4.421(a)(1) permits trial courts to consider whether "[t]he crime involved . . . *threat* of great bodily harm" and not merely whether the victim in fact suffered "great bodily harm." (See Cal. Rules of Court, rule 4.421(a)(1), italics added.) Moreover, Bell concedes there is evidence that: Bell "punched [T.F.] in the head, face, legs, and ribs multiple times"; he "kicked and pushed" T.F. "[w]hen she tried to shield herself by curling into a ball"; and T.F. "sustained swelling and bruising around her right eye and bruises on both arms." Yet, Bell does not explain why this evidence is insufficient to show that he subjected T.F. to a threat

of great bodily harm.  We thus conclude that the record supports the trial court's ruling.  (Cf. *People v. Hopkins* (1978) 78 Cal.App.3d 316, 318–319, 321 [concluding that a defendant who "beat and kick[ed] [the victim] in the head" multiple times, thereby causing the victim to "suffer[ ] a cut on the forehead, . . . a bloody and swollen nose, and puffed eyes," had used force that "can only be categorized as . . . force likely to cause serious bodily harm" for the purposes of assault by means of force likely to produce great bodily injury].)

Lastly, although Bell claims that four published appellate decisions involving section 273.5 convictions "illustrate markedly higher levels of violence and greater threats of bodily harm than were present in this case," he does not argue that these are "ordinary" cases or that they present the only factual scenarios in which the threat of great bodily injury was "distinctively worse than the ordinary."   (Citing *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1358; *People v. Tennard* (2017) 18 Cal.App.5th 476, 481–482; *People v. Belton* (2008) 168 Cal.App.4th 432, 436; *People v. Mora* (1996) 51 Cal.App.4th 1349, 1352.)  Thus, Bell fails to establish that the trial court abused its discretion in impliedly finding that the instant case was distinctively worse than the "ordinary" section 273.5, subdivision (a) case.  (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 (*Sanghera*) ["Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error."].)

For these reasons, we conclude that the trial court did not act " 'arbitrar[ily] or irrational[ly]' " in relying in part upon this

11

aggravating factor in the course of determining Bell's prison sentence.  (See *Lamb*, *supra*, 206 Cal.App.3d at p. 401.)

## 2.	*High Degree of Callousness*

Bell challenges his sentence to the extent it is predicated on the trial court's finding that he acted with a high degree of callousness.  In making this claim, Bell does not dispute the People's assertions that:  "(1) Bell's attack occurred while he was staying at [T.F.'s] house . . . ; (2) after [T.F.] offered to hire Bell [a transportation service] to take him home, he grew angry, and began pushing, threating and throwing fake punches at her while insisting she drive him herself; (3) when [T.F.] referred to some handymen nearby, Bell told her that he did not 'give a fuck' and that he would 'fuck [her] up anyway' "; (4) Bell 'wanted to control the situation throughout,' and was not remorseful; and (5) [T.F.] asked Bell to work on her door as a way to appease him."  Bell actually concedes that "these [facts] all . . . constitute insensitive, and even cruel actions . . . ."

Notwithstanding this concession, Bell contends that the aforesaid behavior cannot support the imposition of the upper prison term because it is "not out of line with, or in other words, rising to the level of a 'high degree of . . . callousness[,]' when compared with behaviors often seen within the context of a relationship involving domestic violence."  This argument is premised solely on a citation in Bell's reply brief to a page on the Centers for Disease Control and Prevention's (CDC's) website that discusses "intimate partner violence."  Bell maintains that, because this webpage shows that "violence among intimate partners can take the form of not only physical and sexual violence, [but] also . . . 'the use of verbal and non-verbal communication with the intent to harm another person mentally

12

or emotionally and/or to exert control over another person[,] [citation,] . . . [t]he examples [the People] raise[ ] all fall into range of the types of the cruel and callous forms of physical and psychological harms and behaviors that constitute domestic or intimate partner violence." (Fn. omitted.)

We disregard this argument because "our review on appeal is limited to consideration of the matters contained in the record before us," (*People v. Endsley* (2016) 248 Cal.App.4th 110, 123), and Bell does not contend that the page from the CDC's website is judicially noticeable. (See also Evid. Code, § 459, subd. (a) [providing that a reviewing court may take judicial notice of certain matters that were not before the trial court].) Thus, Bell fails to establish that the trial court erred in relying upon this aggravating factor.

### 3. *Particular Vulnerability of T.F.*

Although Bell insists T.F. was not particularly vulnerable, he does not dispute there was evidence that Bell "had blocked [T.F.'s] egress during the attack" and that T.F. "later felt that she needed to appease Bell to prevent further attack . . . ." This evidence supports the trial court's finding that T.F. was particularly vulnerable because it tends to show that T.F. was unable to defend herself from Bell's violent behavior. (See *People v. Clark* (1990) 50 Cal.3d 583, 638 ["The 'particularly vulnerable victim' factor supports imposition of the upper term if the victim is vulnerable 'in a special or unusual degree, to an extent greater than in other cases [and is] defenseless, unguarded, unprotected, accessible, assailable . . . susceptible to the defendant's criminal act.' "].)

Bell cites *People v. Mora* (1996) 51 Cal.App.4th 1349, 1355 (*Mora*), and *Butler v. Curry* (9th Cir. 2008) 528 F.3d 624, 650

13

(*Butler*), for the proposition that "[t]hese [facts] are among the classic hallmarks of vulnerability that prompted the California legislature to enact section 273.5 and make it a potential felony." Although Bell's argument on this point is not entirely clear, he seems to argue that *Mora* and *Butler* establish that vulnerability is inherent in a romantic relationship. (See *Mora*, *supra*, 51 Cal.App.4th at p. 1355 ["[S]ection 273.5 serves to protect partners in a special relationship from which society demands, and the victim may reasonably expect, stability and safety. In such relationships, the victim may be particularly vulnerable."]; *Butler*, *supra*, 528 F.3d at p. 650 ["[I]t is in the nature of domestic violence that its victims are vulnerable, because of their close relationship with their attacker, their attacker's typically greater physical strength, and their isolation in their homes."].) From this proposition, he appears to assert something more is needed for vulnerability to be a factor in imposing the high term. Accepting for argument's sake only that vulnerability is implicit in a romantic relationship, *Mora* and *Butler* do not undermine the trial court's finding that T.F. was particularly vulnerable. Neither case holds that a perpetrator's blocking a victim of physical violence's means of egress and the victim's feeling compelled to appease the perpetrator in order to avoid further injury are merely inherent vulnerabilities in a romantic relationship.

Thus, Bell has not overcome the presumption of correctness as to the trial court's decision to impose the upper prison term based in part on T.F.'s particular vulnerability. (See *Sanghera*, *supra*, 139 Cal.App.4th at p. 1573 [holding that the appellant must affirmatively demonstrate trial court error].)

14

### 4. *Mitigating Factors*

Bell complains the trial court did not consider adequately the following mitigating factors: (a) T.F. had been "a physical aggressor in trying to take Bell's phone from him prior to the incident and . . . admitted slapping Bell in a past altercation"; (b) Bell's long-standing substance abuse may have contributed to the incident; and (c) Bell had multiple letters of support submitted on his behalf. Bell's opening brief intimates that the sole basis of this argument is the lower court's statement that it did not "really see a lot of mitigating circumstances." This claim is unavailing.

" 'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in qualitative as well as quantitative terms.' " (*Lamb*, *supra*, 206 Cal.App.3d at p. 401.) Further, "the trial court need not state reasons for minimizing or disregarding circumstances in mitigation." (*Ibid.*)

The trial court's statement that it did not "really see *a lot of* mitigating circumstances" does not demonstrate that it ignored the mitigating factors Bell identifies. (Italics added.) Rather, the court's observation suggests that in the exercise of its sentencing discretion, the court gave minimal weight to those factors. Because Bell does not direct us to any evidence to the contrary, we presume that the trial court permissibly exercised its discretion in this manner. (See Cal. Rules of Court, rule 4.409 ["Relevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise."]; *People v. Giordano* (2007) 42 Cal.4th 644, 666 ["On appeal, we presume that a judgment or order of the trial court is correct,

' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' "].)

Additionally, the trial court stated at the sentencing hearing that it had "read and considered the probation report, along with the sentencing reports." In Bell's sentencing memorandum, he advanced two of the three mitigating factors he asserts on appeal—i.e., his "chronic substance abuse may . . . have been a contributing factor to the . . . offense" and T.F. "was the physical aggressor in trying to obtain . . . Bell's phone" and had "admitted to slapping [Bell]" on a prior occasion. Furthermore, Bell admits that he attached "the multiple letters of support submitted on [his] behalf" to his sentencing memorandum. Thus, the record affirmatively demonstrates that the trial court considered each of Bell's cited mitigating factors, but exercised its discretion to give them little weight.

## B. The Record Does Not Show that the Trial Court Precluded Bell from Introducing Evidence that T.F. Had Previously Hit Herself

Bell avers the trial court committed reversible error by excluding evidence that T.F. hit herself in the head approximately one month before the November 2, 2017 incident. We disagree.

It is undisputed: (1) the trial court did not rule on the People's motion to exclude this evidence, and (2) despite the trial court's invitation, Bell did not make an offer of proof to allow the court to assess whether Bell had "a good faith basis" for admitting this evidence.

There is also no dispute that the only occasion on which Bell attempted to introduce evidence that T.F. harmed herself

16

was when defense counsel asked Bell's mother "a single question" on the subject. Specifically, defense counsel asked Bell's mother: "Did Mr. Bell ever tell you that [T.F.] had hit herself at a birthday party?" Bell's mother replied, "Yes." The People then stated: "Objection, that calls for hearsay. 402." The trial court responded: "Sustained. [¶] The jury is to disregard it." The court did not further elaborate on its rationale for sustaining this evidentiary objection.

Bell does not challenge the People's hearsay objection. Rather, Bell intimates that because the People's objection also obliquely referenced their pretrial motion to exclude this evidence (i.e., because the People mentioned Evidence Code section 402 in addition to the hearsay rule), the trial court's decision to sustain the objection in question must have been based upon the finding that the evidence was irrelevant, was barred by Evidence Code section 352, and/or was inadmissible for the reasons provided in the People's pretrial motion to exclude. Bell further contends that such a ruling was erroneous.

Given that the trial court did not issue a ruling on the People's pretrial motion and the court could have sustained the People's evidentiary objection solely on the ground that defense counsel's question called for hearsay, we presume that the court did not commit the error Bell asserts, to wit, that the trial court purportedly excluded the evidence as irrelevant, under Evidence Code section 352 as prejudicial, and/or for the reasons provided in the People's pretrial motion to exclude. (Cf. *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1140–1141 [rejecting a hearsay challenge to the admission of certain expert testimony because the record did not disclose the underlying source of the expert's testimony and the Court of Appeal "must presume all

17

intendments and presumptions in favor of the judgment," meaning that " ' " 'on matters as to which the record is silent, . . . error must be affirmatively shown' " ' "].)

We thus do not accept Bell's invitation to opine on whether the court *would have* committed reversible error *had* it made such a ruling. (See *People v. Slayton* (2001) 26 Cal.4th 1076, 1084 ["As a general rule, we do not issue advisory opinions indicating ' "what the law would be upon a hypothetical state of facts." ' "].)

In sum, the record does not establish that the trial court perpetrated the error of which Bell complains.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

SINANIAN, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18